**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-559

CENTER FOR BIOLOGICAL DIVERSITY, and
CENTER FOR ENVIRONMENTAL HEALTH,

      Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
MICHAEL S. REGAN, in his official capacity as
Administrator, United States Environmental Protection Agency,

      Defendants.

**COMPLAINT**

## I.      INTRODUCTION

1. This dispute is about the U.S. Environmental Protection Agency's unreasonable delay under the Clean Air Act.

2. At the time of filing this lawsuit, it has been 14 months since the United States Court of Appeals for the Tenth Circuit granted the Environmental Protection Agency's motion for voluntary remand in *Center for Biological Diversity v. EPA*, which requires EPA to further review its initial approval of Colorado's proposed infrastructure state implementation plan for the 2015 8-hour ozone national ambient air quality standard.  No. 20-9560 (10th Cir. 2020).

3. Since the voluntary remand, EPA has not published a final rule detailing its new analysis or decision regarding Colorado's infrastructure state implementation plan.

1

4. Since the remand was granted, the Denver Metro / North Front Range has recorded some of the worst air quality days of any major city in the world, with ozone levels far exceeding federally established standards. Areas in Colorado that historically have not been designated as violating ozone ambient air quality standards, such as Colorado Springs, are now also exceeding the federally established ozone pollution limits.

5. Areas downwind of Colorado, like the Uinta Basin, Northern Wasatch Front, and Southern Wasatch Front in Utah are experiencing high levels of ozone pollution and exceeding federal standards.

6. People living in areas with ozone pollution can experience negative health effects. Health consequences include coughing, breathing difficulty, lung infections, aggravation of respiratory diseases, asthma attacks, and even premature death.

7. EPA's continued delay in its further review of Colorado's infrastructure state implementation plan leaves Colorado without an ozone plan effective enough to combat ozone pollution.

8. EPA's continued delay in its further review of Colorado's ozone plan thus renders people in Colorado vulnerable to negative, and in some cases irreversible, health effects due to their continued exposure to ozone.

9. It is for these reasons that the Center for Biological Diversity and the Center for Environmental Health file their complaint against EPA and Michael S. Regan in his official capacity as Administrator of the EPA (together referred to as "EPA"), asking this Court to compel EPA to complete its review and take final action on Colorado's infrastructure state implementation plan.

## II.    JURISDICTION AND VENUE

10. This action arises under the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604(a): "[t]he district courts of the United States shall have jurisdiction to compel . . . agency action unreasonably delayed."

11. This Court therefore has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a) (agency action unreasonably delayed) and 28 U.S.C. § 1331 (federal question). The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief).

12. Pursuant to 42 U.S.C. § 7604(a), Environmental Groups sent EPA a written Notice of Intent to Sue on August 18, 2021. The Administrator received the Notice on August 23, 2021.  More than 180 days have passed since the Administrator received the Notice. The Administrator has not remedied his violations of the Clean Air Act as alleged in the Notice. An actual controversy therefore exists between the parties.

13. Any final action on Colorado's 2015 ozone national ambient air quality standard infrastructure state implementation plan is reviewable in the U.S. Court of Appeals for the 10th Circuit.  Colorado is in the 10th Circuit.  Therefore, venue is proper in this Court pursuant to the Clean Air Act, 42 U.S.C. § 7604(a).

## III.    PARTIES

14. Plaintiff the Center for Biological Diversity is a non-profit 501(c)(3) corporation.  The Center for Biological Diversity has over 89,000 members throughout the United States and the world.

15. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center for Biological Diversity is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us.

16. Plaintiff the Center for Environmental Health is a nonprofit organization.  It has approximately 30,000 supporters across the United States.

17.  The Center for Environmental Health helps protect the public from toxic chemicals by working with communities, consumers, workers, governments, and the private sector to demand and support business practices that are safe for public health and the environment.  The Center for Environmental Health works in pursuit of a world in which all people live, work, learn and play in healthy environments.

18. Plaintiffs' members live, work, recreate, travel, and engage in other activities throughout the areas at issue in this complaint and will continue to do so on a regular basis. Pollution in the affected areas threatens and damages, and will continue to threaten and damage, the health and welfare of Plaintiffs' members, as well as their ability to engage in and enjoy activities, particularly outdoor activities such as walking, biking, hiking, and playing with their children.

19. EPA's failures also harm Plaintiffs' members' welfare interest in using and enjoying the natural environment.  Ozone damages plant life and natural ecosystems, thus harming

Plaintiffs' members' recreational and aesthetic interests in the areas at issue in this complaint.

20. In addition, EPA's failure to timely perform its mandatory duties adversely impacts Plaintiffs' members by depriving them of procedural protection and opportunities, as well as other information they are entitled to under the Clean Air Act.

21. The above injuries will continue until the Court grants the relief requested. A court order requiring EPA to promptly undertake its mandatory duties would redress Plaintiffs' and Plaintiffs' members' injuries.

22. Defendant Michael S. Regan is the Administrator of the Environmental Protection Agency, and is sued in his official capacity.

23. Defendant Environmental Protection Agency is a federal agency charged with the implementation of the Clean Air Act, and, as part of that duty, is responsible for reviewing and taking final action to approve or disapprove state implementation plan submittals.

## IV.   LEGAL BACKGROUND

### A.  Unreasonable Delay

24. Courts shall have jurisdiction to compel agency action under the Clean Air Act that is unreasonably delayed.  42 U.S.C. § 7604(a).

25. The D.C. Circuit Court of Appeals has provided the following six factors to determine whether agency action has been unreasonably delayed ("TRAC Factors"):

   i.    the time agencies take to make decisions must be governed by a rule of reason;

ii.    where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

iii.    delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

iv.    the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

v.    the court should also take into account the nature and extent of the interests prejudiced by delay; and

vi.    the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).

26. Courts should also consider whether the delay may be undermining the statutory scheme, either by frustrating the goal of the statute or creating a situation where the agency is losing its ability to effectively regulate. *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987).

27. Further, "delays that might be altogether reasonable in the sphere of economic regulation are less tolerable when human lives are at stake." *Id.*

**B. The Clean Air Act: National Ambient Air Quality Standards and State Implementation Plans**

28. The Clean Air Act requires EPA to identify air pollutants that endanger public health and welfare. 42 U.S.C. § 7409. Once identified, EPA must establish ambient pollution standards for those air pollutants at levels which protect public health with "an adequate margin of safety." *Id.* These ambient pollution limits are referred to as national ambient air quality standards (NAAQS).

29. At issue in this case is the 8-hour ozone NAAQS set in 2015. This standard defines the allowable level for the concentration of ground-level ozone as 70 parts per billion (ppb) in the ambient air over an eight-hour period.

30. After EPA promulgates a NAAQS, it must determine whether each area of the country is in compliance with the NAAQS. Areas where air quality fails to meet the NAAQS for a particular pollutant are classified as "nonattainment" areas for that pollutant. Ozone nonattainment areas are further classified based on how much their ozone air concentrations exceed the NAAQS, and that classification dictates how long the area has to reach attainment. Ozone nonattainment areas are classified as follows:

   a. Marginal nonattainment areas must achieve attainment within 3 years of classification.

   b. Moderate nonattainment areas must achieve attainment within 6 years of classification.

   c. Serious nonattainment areas must achieve attainment within 9 years of classification.

     d.  Severe nonattainment areas must achieve attainment within 15 years of classification.

     e.  Extreme nonattainment areas must achieve attainment within 20 years of classification.

42 U.S.C. § 7511(a)(1).

31. The attainment deadlines are "central to the . . . regulatory scheme and . . . leave no room for claims of technological or economic infeasibility." *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 258 (1976)).

32. Once EPA sets a NAAQS and designates an area as nonattainment or attainment, the Clean Air Act requires each state to develop a plan within three years that implements, maintains, and enforces the new air quality standard. 42 U.S.C. § 7410. These plans are known as infrastructure state implementation plans. Each state is required to submit its infrastructure state implementation plan to EPA for approval or disapproval. *Id.*

33. Once EPA determines a state implementation plan submission meets the minimum criteria, EPA has 12 months to approve or disapprove it, based on whether it complies with all relevant requirements of the Clean Air Act. 42 U.S.C. § 7410(k)(1)–(6).

34. EPA uses computer modeling to determine whether proposed state implementation plans satisfy certain requirements. Under the Clean Air Act, EPA should ensure the state considered the air quality modeling provided by EPA. 42 U.S.C. § 7410(a)(2)(K).

35. EPA made ozone transport modeling data available to the states for the 2015 ozone NAAQS.

36. Once EPA's review of the proposed state implementation plan is complete, it must publish a proposed rulemaking in the Federal Register announcing whether it intends to approve or disapprove the plan, based on whether the plan meets the requirements of the Clean Air Act.

37. The proposed rulemaking is made available for public comment, which allows the public to raise any objections, oversights or concerns with EPA's findings and proposed ruling. EPA is required to take all public comments into consideration and revise the proposed rulemaking based on those comments if necessary. This process is integral to ensuring that EPA's conclusions regarding the proposed plan are accurate, and that the ruling on the proposed plan is in accordance with the law.

38. EPA then publishes a final rule, which should take all public comment into account, and approves or denies the proposed plan, either in whole or in part, in the Federal Register.

C.  **Requirements at Issue in the Remanded Colorado State Implementation Plan**

39. Out of the thirteen elements required by the Clean Air Act to be in Colorado's infrastructure state implementation plan for the 2015 ozone NAAQS (Colorado's "ozone plan"), EPA's motion for voluntary remand stated its intent to focus only on the two challenged pieces of the plan upon remand: the Good Neighbor Provision element, 42 U.S.C. § 7410(a)(2)(D)(i), and the requirement that Colorado have adequate authority under state law to implement its plan, 42 U.S.C. § 7410(a)(2)(E)(i) .

## 1. The Good Neighbor Provision

40. The first element in Colorado's ozone plan remanded for further review deals with the Good Neighbor Provision of the Clean Air Act, which addresses the interstate transportation of air pollution. *See generally EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014).

41. EPA must ensure state plans contain adequate provisions which prohibit "any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will – contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such [NAAQS] . . . ." 42 U.S.C. § 7410(a)(2)(D)(i)(I).

42. EPA has interpreted "significant contribution" to be one percent of the NAAQS in all ozone transport actions since 2011. *Air Plan Approval; FL, GA, NC, SC; Interstate Transp. (Prongs 1 and 2) for the 2015 8-Hour Ozone Standard*, 86 Fed. Reg. 68413, 68418 (Dec. 2, 2021).

43. The Good Neighbor Provision is necessary since "downwind States to which the pollution travels are unable to achieve clean air because of the influx of out-of-state pollution [which] they lack authority to control." *EME Homer City*, 572 U.S. at 495.

44. The D.C. Circuit has ruled that an upwind state is in violation of the Good Neighbor Provision if it contributes a significant amount of pollution to a downwind state. *See*, *e.g.*, *New York v. EPA*, 964 F.3d 1214, 1226 (D.C. Cir. 2020); *Maryland v. EPA*, 958 F.3d 1185,

1203 (D.C. Cir. 2020); *Wisconsin v. EPA*, 938 F.3d 303, 313–14 (D.C. Cir. 2019); *North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008).

45. If EPA's computer modeling demonstrates that a state does contribute significantly to downwind states' nonattainment, the state's proposed plan must contain adequate pollution controls that will mitigate their contribution to the downwind state.

46. When modeling an upwind state's contribution to a downwind state, the modeled year must be no later than the year by which the downwind state must come into compliance with the NAAQS, i.e., by its attainment date. *Maryland*, 958 F.3d at 1203; *see also Air Plan Approval; FL, GA, NC, SC; Interstate Transp. (Prongs 1 and 2) for the 2015 8-hour Ozone Standard,* 86 Fed. Reg. 37,942 (July 19, 2021) (evaluating Good Neighbor provision for Florida, Georgia, North Carolina, and South Carolina using 2021 attainment deadline in light of *Maryland v. EPA* decision).

## 2. The State must have Authority under State Law to Implement its Proposed State Implementation Plan

47. The second element of Colorado's plan remanded in this case requires a state implementation plan to provide "necessary assurances that the State . . . will have adequate . . . authority under State . . . law to carry out such implementation plan (and is not prohibited by any Provision of . . . State law from carrying out such implementation plan or portion thereof)". 42 U.S.C. § 7410(a)(2)(E).

48. Specifically, EPA must determine whether Colorado state law's prohibition on regulating air pollution from agricultural sources renders the state unable to carry out its implementation plan.

### i.    The Colorado Agriculture Exemption

49. The Colorado Air Pollution Prevention and Control Act is a state law that creates the Air Quality Control Commission within the Colorado Department of Public Health and Environment and lays out a framework for how the state will regulate air quality. Colo. Rev. Stat. §§ 25-7-101 to -1309.

50. Colorado law prohibits the Air Quality Control Commission from regulating emissions from agricultural production coming from non-major stationary sources. Colo. Rev. Stat. § 25-7-109(8)(a).

51. A major stationary source of pollution is defined by the Clean Air Act as "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant." 42 U.S.C. § 7602(j). Under this definition, agricultural emissions from soil, pesticides, fertilizer, tractors, heavy farming equipment, and concentrated animal feeding operations generally do not qualify as major stationary sources and therefore go unregulated.

### V.    FACTUAL BACKGROUND

### A.  The Harmful Characteristics of Ozone

52. Ground level ozone forms in the Earth's troposphere when nitrogen oxide and volatile organic compounds (VOCs) react in the presence of sunlight.

53. Methane and carbon monoxide are also precursor emissions that can lead to the formation of ozone.

54. Ozone-forming pollutants, like methane and nitrogen oxides, come from many sources such as fossil fuel extraction and combustion, as well as agricultural emissions. Ozone pollution causes respiratory problems, aggravates lung diseases, and increases the frequency of asthma attacks.

55. Increased ozone exposure is associated with the risk of death from respiratory causes, especially during summer months.

56. Ozone exposure causes more than one million premature deaths globally each year.

57. Short-term ozone exposure causes inflammation in the respiratory tract that can persist for at least 18 to 24 hours after exposure. This lung inflammation can completely subside for some people, but for others it can lead to a chronic inflammatory state. Continued chronic inflammation can lead to cellular damage and lung injury, which can lead to the other, more serious health effects listed above.

58. Short-term ozone exposure can also have cardiovascular effects, such as high frequency heart rate variability and death due to cardiovascular issues.

59. Long-term exposure to ozone permanently damages airways and lung tissue, which can lead to the development and progression of chronic lung disease. Long-term ozone exposure also leads to the development of new-onset asthma.

60. Those most at risk of these negative health effects include children, the elderly, people with lung diseases including asthma, and people who work or exercise outside.

61. The respiratory symptoms resulting from ozone exposure result in adverse health outcomes, such as limitations in outdoor or physical activity.

62. The respiratory symptoms caused by ozone exposure also require people with asthma to rely on quick relief medication use and seek additional medical care.

63. There is also a causal relationship between short-term ozone exposure and increased respiratory-related hospital admissions and emergency room visits. Hospital visits for respiratory issues increase in warmer months, when there is usually more ozone creation due to precursor emissions interacting with the sun.

64. In addition to its impacts on human health, ozone pollution is also harmful to plants and results in negative impacts on ecosystems. Ozone is the most damaging air pollutant to plants, creating more damage than all other air pollutants combined.

65. Ozone can interfere with photosynthesis, which can negatively affect plant growth, reproduction, and crop yield. Ozone exposure also damages plant foliage.

66. The negative effects on plant life can lead to large-scale environmental effects, such as decreased ecosystem productivity and carbon sequestration, as well as changes in ecosystem composition and water cycling.

67. Such negative impacts are predicted to cause a 13% decline in wheat production, 28% decrease in soybean production, and 43% decrease in the production of corn by 2050.

**B.  The 2015 Ozone NAAQS**

68. EPA promulgated the 2015 ozone NAAQS on October 1, 2015, lowering the allowable concentration of ground-level ozone from the 75 parts per billion (ppb) limit established in 2008 to 70 ppb. EPA set a more protective standard due to extensive scientific evidence

that indicates ozone pollution has significant negative impacts on public health and welfare even when it is below 75 ppb.

69. The Denver Metro / North Front Range area of Colorado was designated as a marginal nonattainment area under the 2015 ozone NAAQS.

70. The Denver Metro / North Front Range region's major sources of pollution include typical urban activities, intense oil and natural gas production, and large animal feeding operations.

71. Outside of Colorado, the Uinta Basin, Northern Wasatch Front, and Southern Wasatch Front in Utah were also designated as marginal nonattainment areas under the 2015 ozone NAAQS.

72. Marginal nonattainment areas were to reach attainment by 2021 under the 2015 ozone NAAQS. The Denver Metro / North Front Range area failed to attain the 2015 ozone NAAQS by its marginal nonattainment deadline and EPA will likely have to downgrade this area from a marginal classification to a moderate classification.

73. Marginal nonattainment areas downwind of Colorado such as the Uinta Basin in Utah exceeded the NAAQS in 2020, and ozone pollution continues to exceed the 2015 ozone NAAQS.

**C.  The Center for Biological Diversity's 2020 Action for Judicial Review and EPA's Voluntary Remand**

74. Colorado initially submitted its ozone plan to EPA for approval on September 17, 2018.

75. On September 17, 2019, Colorado supplemented its submission to EPA by including comments submitted by the Center for Biological Diversity and other exhibits.

76. EPA approved Colorado's ozone plan in full on April 10, 2020.

77. The Center for Biological Diversity filed a petition for review in the U.S. Court of Appeals for the Tenth Circuit on June 9, 2020, seeking review of EPA's final rule approving the plan.

78. The Center for Biological Diversity alleged that the final rule needed to be remanded for two reasons: first, the plan did not comply with the Good Neighbor Provision because the modeling used was flawed, relying on the wrong future analytic year and repealed pollution reduction rules; and second, because Colorado did not have adequate authority to implement its plan due to a state law exemption for agricultural emissions.

79. EPA filed its Unopposed Motion for Voluntary Remand on December 31, 2020.

80. In its Motion for Voluntary Remand, EPA stated its desire to reconsider its approval of Colorado's ozone plan in light of the *Maryland* decision.

81. *Maryland* held that when modeling an upwind state's contribution to a downwind state, the modeled year must be no later than the year by which the downwind state must come into compliance with the NAAQS, i.e., by its attainment deadline.

82. In addition to reviewing relevant judicial decisions and its analysis of the Colorado Air Pollution Prevention and Control Act's impact on whether Colorado has authority under state law to implement its plan, the motion for voluntary remand stated that EPA would supplement the administrative record with additional information and analysis, take and consider additional comment, and provide further explanation of its assessment of the challenged aspects of the final rule.

83. EPA explicitly acknowledged in its motion for voluntary remand that "[i]f, in the future, [the Center for Biological Diversity] believes that EPA has unreasonably delayed in taking action on remand, [it] can seek relief by bringing an unreasonable delay claim."

84. The Tenth Circuit granted EPA's remand motion on Jan. 5, 2021, remanding the final rule to EPA without vacatur for proceedings consistent with the remand motion.

85. Since being granted voluntary remand, EPA has not determined whether Colorado's state implementation plan complies with the Good Neighbor Provision, particularly with respect to the Uinta Basin. Utah.

86. EPA has not published its analysis of or provided additional explanation of its reading of the Colorado Air Pollution Prevention and Control Act and its impact on the Clean Air Act's requirement that Colorado have adequate authority under state law to implement its ozone plan.

87. EPA has not proposed whether to deny or approve Colorado's state implementation plan.

88. EPA has not published a proposed rulemaking explaining any further analysis it has done or findings it has made in relation to Colorado's proposed plan.

89. EPA has not made any proposed findings available for public comment on Colorado's remanded infrastructure state implementation plan.

90. The Environmental Groups have been unable to comment or otherwise meaningfully participate in the regulatory process.

91. Even if EPA publishes a proposed rulemaking, the State will not have an enforceable and complete infrastructure state implementation plan until a final rule is adopted by EPA.

92. The public has not had the opportunity to comment on  new issues that have arisen since the voluntary remand.

93. Issues associated with EPA's Good Neighbor Provision modeling and the Colorado Agriculture Exemption, as well as new issues that have arisen since the voluntary remand, will not be formally resolved until EPA publishes a final rule.

**D.  Colorado's Worsening Air Quality**

94. The majority of Colorado's state implementation plan became effective on May 11, 2020.

95. Although the majority of Colorado's infrastructure state implementation plan has been effective for nearly two years, Colorado is still not in attainment.

96. Of Colorado's nearly 6 million residents, over 3 million people are living in nonattainment areas.

97. Since the court granted EPA's voluntary remand, Colorado has experienced some of the worst ozone conditions in recent history.

98. There has been a continuation of downward trends in air quality over the last several years, and the number of days with 8-hour ozone levels above the 70 ppb threshold designated by the 2015 NAAQS has risen drastically, especially in the Northern Front Range region of Colorado.

99. In 2021 there were more extreme ozone days along the Front Range Region with levels above 84 ppb than in any other year since 2003.

100. The Front Range Region had more days over 75 ppb in 2021 than in any other year since 1995.

101. In 2021, there were 65 issued "ozone action days" as compared to 22 in 2010.

102. Ozone action days are days "when weather conditions are likely to combine with pollution emissions to form high levels of ozone near the ground that may cause harmful health effects."

103. The ozone design value for the Denver Metro/North Front Range Region has risen from 0.078 ppm (2017-2019) to 0.081 (2018-2020).

104. The "ozone design value" is used by EPA to determine if areas are meeting the NAAQS, and is composed of a summary statistic which is the annual fourth-highest daily maximum 8-hour ozone concentration averaged over three years. The 3-year average is computed using the 3 most recent, consecutive calendar years of monitoring data.

105. The Denver Post printed an article on August 7, 2021, stating that Denver's air quality on that summer day was the worst air quality of any major city on the planet.

106. Further, new areas are now being affected by the worsening problem. Monitors in Colorado Springs, which is currently designated as an attainment area by EPA, now violate the 2015 ozone NAAQS because their 2018 – 2020 three-year ozone design values are above 70 ppb.

107. In attainment areas, the infrastructure state implementation plan is the only plan in effect to address health impacts and limit ozone emissions and their impacts on highly susceptible people with respiratory conditions.

108. The Colorado Sun has reported that despite Colorado's failure to meet the NAAQS set by EPA, the World Health Organization believes that the standard should be even tougher to protect from the public health effects of ozone.

109. The Colorado Department of Public Health and Environment has reported that "due to high ozone levels recorded during July and August 2020, the [Northern Front Range] area may be reclassified by EPA as "severe" under the 2008 standard and "moderate" under the 2015 standard in late 2021 or early 2022."

### E.   The Uinta Basin's Worsening Air Quality

110. The Uinta Basin in Utah sits right over the Colorado border and is designated as a marginal nonattainment region.

111. In 2019, the Uinta Basin area had multiple days over the 70 ppb 8-hour ozone standard in January, February, and March.

112. EPA has not conducted detailed modeling to demonstrate whether Colorado significantly contributes to the Uinta Basin's ozone levels.

113. This modeling was not conducted despite the fact that the Uinta Basin had not reached attainment at the time that modeling was conducted for other states.

114. The latest 3-year (2018 – 2020) design value for the area is 0.076 ppm, remaining well above the 2015 ozone NAAQS.

115. People with respiratory issues are affected by ozone pollution in this region. The Air Quality Index (AQI) for the Uinta Basin is consistently above the threshold which denotes acceptable levels of death, disease, and public welfare impacts, and is set to protect people with respiratory issues.

**F.  Ozone Emissions from Agriculture**

116. Colorado cannot regulate the primary sources of agricultural emissions under state law because agricultural emissions generally are not created by major stationary sources.

117. The chemical link between various agricultural activities and increased ground level ozone is well understood and should be accounted for in plans to address ozone within Colorado.

118. Emissions from agricultural operations are one of six major categories of human-made sources of local ozone production in the Northern Front Range region.

119. Further, concentrated animal feeding operations are particularly susceptible to underestimates of their methane emissions, which can exacerbate poor air quality on high ozone days when oxidation of methane accelerates the formation of ground level ozone.

120. Agricultural emissions pose various detrimental threats to human health, as they contribute to atmospheric ozone accumulation.

121. Industrial agriculture releases a variety of chemical compounds which contribute to higher levels of ozone formation. For example, in a 2018 study in California, scientists found that air pollution from fertilizer applications and soil emissions produced significant emissions of nitrogen oxides, a precursor compound to ozone.

122. VOCs generated by concentrated animal feeding operations have also been found to increase the level of VOCs that contribute to ozone formation.

**G. EPA's Actions Since Voluntary Remand**

123. EPA has addressed the Good Neighbor Provision in other states' implementation plans in accordance with recent case law such as *Maryland*.

124. In approving state implementation plans in Florida, Georgia, North Carolina, and South Carolina, EPA modeled states' ozone contributions to downwind states using the attainment deadline of 2021. EPA used the downwind states' attainment deadline of 2021 in response to the *Maryland* and *Wisconsin* cases.

125. Furthermore, EPA has also disapproved plans submitted by New York and New Jersey related to interstate transport requirements for the 2008 8-hour ozone NAAQS.

126. At the time of filing this complaint, EPA has not published a new decision with respect to Colorado's ozone plan.

127. EPA was required to take final action on Colorado's infrastructure state implementation plan for the 2015 ozone NAAQS by no later than September 17, 2020.

128. It has been over thirteen months since the Tenth Circuit remanded this to EPA, and Colorado's air quality continues to deteriorate.

## VI.     CLAIM FOR RELIEF
(Compel Agency Action Unreasonably Delayed)

129. Under the Clean Air Act, this Court should compel agency action unreasonably delayed.

130. Congress set a deadline of June 28, 2020 for the State of Colorado to have a state implementation plan in place. *See* 42 U.S.C. § 7410(a)(1), (k)(1) – (2).

131. At the time of filing this complaint, Colorado is well past a year and a half behind the Congressional deadline.

132. Human health, including irreversible impacts such as death and asthma attacks, and welfare are at stake while ozone concentrations remain well above the NAAQS. Additionally, in areas that are in attainment, the infrastructure state implementation plan is the primary tool in place to address impacts on highly susceptible people with respiratory conditions who can suffer even when ozone design values are below the 70 ppb NAAQS threshold.

133. EPA has finalized actions related to the Good Neighbor Provision for other states in situations similar to Colorado.

134. These factors demonstrate that EPA has unreasonably delayed taking final action on the remanded elements of Colorado's infrastructure state implementation plan for the 2015 ozone NAAQS.

## VII.    REQUESTED RELIEF

Environmental Groups respectfully request that this Court enter judgment against EPA:

1. granting declaratory relief by ruling that EPA has unreasonably delayed under the Clean Air Act;

2. compelling EPA to act on the voluntary remand at issue by a date certain;

3. awarding costs and fees of this action to Environmental Groups;

4. retaining jurisdiction over this matter to ensure compliance with the Court's order; and

5.  awarding such other relief as the Court deems just and proper.

Respectfully submitted this 8th day of March, 2022.[*]

_s/ Kevin J. Lynch_

Kevin J. Lynch
Wyatt G. Sassman
Amy E. Volz
Environmental Law Clinic
University of Denver
Sturm College of Law
2255 E. Evans Ave.,
Denver, CO 80208
Phone: (303) 871-6140
klynch@law.du.edu
wsassman@law.du.edu
avolz@law.du.edu

Robert Ukeiley
Senior Attorney – Environmental Health
Center for Biological Diversity
1536 Wynkoop St., Ste. 421
Denver, CO 80202
Telephone: (720) 496-8568
rukeiley@biologicaldiversity.org

Attorneys for Center for Biological Diversity and Center for Environmental Health

---

[*] Counsel recognize the contributions of student counsel Peyton Lindley, Sarah Jean Rodger, and Daniel Rubin (University of Denver Environmental Law Clinic), who participated substantially in the drafting and researching of this Complaint.